```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION
```

Malisia N. Matthews,            :

     Plaintiff,              :

   v.                              :       Case No.  2:14-cv-1839

                                       :       JUDGE GEORGE C. SMITH
Commissioner of Social Security,        Magistrate Judge Kemp

     Defendant.              :

## REPORT AND RECOMMENDATION

### I. Introduction

Plaintiff, Malisia N. Matthews, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for social security disability benefits and supplemental security income.  Those applications were filed on September 28, 2011 and October 13, 2011, respectively, and alleged that Plaintiff became disabled on October 11, 2008 (which date was later amended to September 28, 2011).

After initial administrative denials of her claim, Plaintiff was given a video hearing before an Administrative Law Judge on April 25, 2013.  In a decision dated May 22, 2013, the ALJ issued a decision denying benefits.  That became the Commissioner's final decision on August 8, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on December 19, 2014.  Plaintiff filed her statement of specific errors on March 23, 2015, to which the Commissioner responded on June 26, 2015.  No reply brief was filed, and the case is now ready to decide.

### II. The Lay Testimony at the Administrative Hearing

Plaintiff, who was 40 years old at the time of the administrative hearing and who has an associates degree in

business, testified as follows.  Her testimony appears at pages 57-73 of the administrative record.

Plaintiff first testified that she last worked on November 29, 2010.  After that date, she attempted work with the Salvation Army but could not do the lifting which was required.  Her last job was as a receptionist, and she received unemployment compensation after she stopped working.

The ALJ asked Plaintiff to explain her symptoms.  In response, she said that she had back pain which affected her ability to stand, sit, or bend.  It radiated into her legs.  She had taken medications which made it hard for her to work and she was pursuing other treatments.  The medications affected her ability to drive.  She did not lift more than ten pounds or stand more than two hours, and sitting for more than two or three hours was a problem as well.  She would lie down two or three times daily for about an hour each time.  Plaintiff could climb stairs with difficulty and she had memory and focus problems.  Being around large numbers of people caused stress.

Plaintiff said she could shower, dress, cook occasionally, and do dishes.  She did not do laundry.  She was taking classes online, but only one at a time.  Other than schoolwork, she typically went to doctors' appointments, to church, or to vocational services.  She also said that she suffered from migraine headaches two or three times per week which lasted from fifteen minutes to two hours, and she had to lie down when a headache came on.  Additionally, she was seeing a counselor and a psychiatrist and took medication for anxiety.  She was going to continue efforts to find work through vocational services, but that had to wait until after she had injections for her back problem.

### III. The Medical and Educational Records

The medical records in this case are found beginning on page

345 of the administrative record.  The pertinent records can be summarized as follows.

### A. <u>Physical Impairments</u>

Plaintiff was treated throughout 2010 and 2011 for chronic back pain.  A note from 2012 shows that her diagnoses at that time included lumbago, sprain and strain, sciatica, a herniated nucleus pulposus, degenerative disc disease, spondylosis, lumbar facet syndrome, cervicalgia, radiculopathy, anxiety, and sleep disturbance.  Various treatment modalities were discussed with her at that time and she was given medications.  (Tr. 655).  No mention was made of a knee impairment.  A back x-ray taken in 2012 showed some facet degeneration with the main disc finding being at L5-S1, but without serious canal or foraminal stenosis. (Tr. 702).

Plaintiff was treated for left knee pain beginning in July, 2012.  She was having difficulty bending her knee and walking up stairs.  It had been swollen but the swelling had gone down on its own.  The knee was tender to palpation and there was some limitation on range of motion.  She was given a home exercise program and the knee was iced.  (Tr. 804-06).  In a physical evaluation report prepared on March 30, 2013, for the Bureau of Vocational Rehabilitation, Dr. Woskobnick did not diagnose any knee condition, however, although he did note bilateral decrease in the range of motion of the knees.  Plaintiff could not do a deep knee bend and she could not toe, heel, or tandem walk.  He did diagnose chronic back pain, among other things, and concluded that she could stand and walk from 1-4 hours in a workday, sit up to 8 hours, lift up to ten pounds occasionally, could occasionally push or pull and bend, and could never squat, crawl, or climb.  (Tr. 915-18).

State agency physicians also weighed in on the question of Plaintiff's physical limitations.  Dr. Thomas, the first of the

two, concluded that Plaintiff had the ability to perform a full range of medium work.  (Tr. 95).  The second, Dr. Vasiloff, disagreed, finding that Plaintiff could do only a limited range of light work, with a number of postural restrictions due to Plaintiff's degenerative disk disease and obesity.  (Tr. 124-26).

B.  <u>Mental Impairments</u>

Dr. Bobba, a psychiatrist, filled out a mental status report on December 6, 2011, indicating that Plaintiff had poor concentration and short-term memory and had a poor ability to carry out various work-related functions.  At that time, she had treated Plaintiff for about a month.  (Tr. 614-16).  That report was preceded by an intake assessment dated October 13, 2011, showing that Plaintiff was concerned about depression, irritability, and crying spells.  Her symptoms had increased since she separated from her husband several months before.  Her mood and affect were depressed and she cried throughout the assessment.  She was diagnosed with a depressive disorder and an anxiety disorder and her GAF was rated at 50.  She was scheduled for weekly counseling sessions.  (Tr. 619-23).

Dr. Bobba completed another evaluation form on May 29, 2012, indicating a number of work-preclusive limitations, including the need to miss about four days of work per month, extreme limitations in the areas of concentration, persistence, and pace, and an inability to meet work standards in many other areas.  The same GAF rating of 50 appears in this report.  (Tr. 747-52).

The record also contains a large number of treatment notes from Plaintiff's mental health providers, including Dr. Bobba.  Plaintiff has summarized them in her statement of errors, <u>see</u> Doc. 3, at 3-11.  That is a generally accurate summary and shows that Plaintiff demonstrated symptoms such as increased psychomotor activity, anxious and irritable mood, labile and variable affect, and memory difficulties.  Her attention and

concentration were indicated as abnormal, and at times she demonstrated pressured speech.  She was treated with Zoloft, Abilify, and Tradnozone (for problems sleeping).

Two state agency reviewers also expressed opinions about Plaintiff's residual functional capacity from a psychological standpoint.  Dr. Warren, a psychologist, found that Plaintiff had some concentration and persistence limitations which affected her ability to carry out detailed instructions and maintain concentration and attention for extended periods, and also had restrictions on her ability to deal with others.  She was also moderately limited in her ability to respond to changes in the work setting.  However, with these limitations, she could still perform work with low production demands or quotas as long as she had only superficial contact with others.  (Tr. 96-97).  Dr. Marlow, another psychologist, concurred.  (Tr. 141-42).

### IV.  The Vocational Testimony

Eric Pruitt was called to testify as a vocational expert.  His testimony begins at page 73 of the administrative record.

Mr. Pruitt described Plaintiff's past employment as a receptionist, which was sedentary and semi-skilled; as a mail sorter, a light, unskilled job; as a bindery worker, which was light and semi-skilled; as a housekeeping cleaner and kitchen assistant at a hotel, both unskilled jobs (one light and one medium); as a mental retardation aide, a medium, skilled position; as a rubber goods assembler, which was light and unskilled; as a hand packager, which was medium and unskilled; and, finally, as a domestic babysitter, a job which was semi-skilled and performed at the medium strength level.  Many of these jobs were short-term and might not have constituted substantial gainful activity.

Mr. Pruitt was then given a hypothetical question which asked him to identify any jobs which could be done by someone who

could lift and carry at the light exertional level, stand and walk for four hours in an eight-hour workday and sit for six, occasionally climb ramps and stairs but never ladders, ropes or scaffolds, frequently balance and stoop, and occasionally kneel, crouch, or crawl.  The person also had to avoid unprotected heights and hazardous machinery.  From a psychological standpoint, the person could understand, remember, and carry out simple and some detailed and complex tasks and job instructions (up to four steps) and could sustain concentration and persistence for minimum two-hour periods.  He or she could also have occasional interaction with supervisors, co-workers, and the general public, could respond appropriately to infrequent changes in the workplace, and was limited to jobs that did not require strict production quotas or production work pace, although goal-oriented work was acceptable.  Mr. Pruitt responded that such a person could do Plaintiff's past job as a mail sorter, but none of her other past jobs.  He or she could also work as a mail clerk, a labeler, and an office helper, however.

    A second hypothetical question was then asked, which described someone who was limited to lifting, carrying, pushing, and pulling only ten pounds.  The other restrictions were the same as in the first question except stooping was limited to occasional and the person could never kneel, crouch, or crawl.  According to Mr. Pruitt, that person could not do any of Plaintiff's past jobs, but could work as an addresser, printed circuit board inspector, or gauger.  He gave numbers for all of these jobs as they existed in the regional, State, or national economies.

    Next, Mr. Pruitt was asked about absenteeism.  He said that an absence from work once every six or seven weeks was acceptable, but that missing two days each month would preclude long-term employment.  Being off task more than 15% of the time

would have the same effect.

     V.  <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 33-45 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2015.  Next, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her amended onset date of September 28, 2011.  Going to the second step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including back disorders, obesity, depression, and anxiety.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to  lift, push, pull, and carry at the light exertional level, stand and walk for four hours in an eight-hour workday, sit for six, occasionally climb ramps and stairs but never ladders, ropes or scaffolds, frequently balance and stoop, and occasionally kneel, crouch, or crawl.  She also had to avoid unprotected heights and hazardous machinery.  From a psychological standpoint, Plaintiff could understand, remember, and carry out simple and some detailed and complex tasks and job instructions (up to four steps) and could sustain concentration and persistence for minimum two-hour periods.  She could also have occasional interaction with supervisors, co-workers, and the general public, could respond appropriately to infrequent changes in the workplace, and was limited to jobs that did not require strict production quotas or production work pace, although goal-

oriented work was acceptable.  With these restrictions, the ALJ concluded that Plaintiff could perform her past mail sorter job and she could do those light jobs identified by the vocational expert, including mail clerk, office helper, and labeler.  The ALJ also found that those jobs existed in significant numbers, as testified to by the vocational expert.  Consequently, the ALJ determined that Plaintiff was not entitled to benefits.

>    VI.   Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises three issues: (1) the ALJ erred in the weight assigned to the opinion of the treating psychiatrist, Dr. Bobba; (2) the ALJ erred in the weight assigned to the opinion of one of the consultative examiners, Dr. Woskobnick; and (3) the ALJ erred by finding that Plaintiff's left knee condition was not a severe impairment and by not factoring limitations caused by that condition into the residual functional capacity finding. These issues are evaluated under the following legal standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into

account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Dr. Bobba's Opinion

As in any case where the ALJ's rationale in rejecting the opinion of a treating source is called into question, it is helpful to explain exactly what the ALJ decided.  Here is what the ALJ said about Dr. Bobba's opinion.

The ALJ first commented that "nothing in [Dr. Bobba's] treatment notes support (sic) the finding the claimant was unable to perform all work activity."  (Tr. 41).  The ALJ then reviewed the evidence concerning activities of daily living, social functioning, and memory, concentration, persistence, and pace, finding that Plaintiff could carry out general activities of daily living, did not demonstrate any social dysfunction, did not demonstrate disordered thought processes, cognitive dysfunction, or intellectual deficits or any psychosis, tangential/ circumstantial thought, loose associations, excessive paranoia, or excessive hallucinations or delusions, and was pursuing a bachelor's degree in criminal justice.  (Tr. 41).

Turning specifically to Dr. Bobba's opinions, the ALJ first gave great weight to the views of the state agency psychologists, finding that they were "consistent with the claimant's level of functioning demonstrated throughout the record and the generally unremarkable mental status evaluations."  (Tr. 42).  The ALJ then gave very little weight to Dr. Bobba's opinion, reasoning that

> his [sic] opinions are inconsistent with the totality

-9-

> of evidence, specifically the claimant's own account of her abilities. The claimant sated she is adequately able to follow instructions (6E). At application, she indicated she was working towards completing her Bachelor's degree in criminal justice by taking online courses (8F/9). She reported she spends a considerable amount of time reading and up to three hours a day, three days a week on the computer completing coursework (6E and testimony). Furthermore, she testified she is actively involved with vocational rehabilitation services to secure employment. In addition, she shops in stores and attends church (6E and testimony). The claimant even reported she feels better around people (8F/8). She also noted she did not have any difficulties with authority figures and she has never been terminated from employment due to limitations in social functioning (6E). More importantly mental status exams are generally unremarkable and the claimant indicated that her medication has improved her symptoms (1F-32F and testimony). These inconsistencies reduce the overall reliability of Dr. Bobba's opinions. Although the undersigned finds the claimant is not capable of unrestricted work, the entirety of the record dose not substantiate the restrictive assessment provided by Dr. Bobba.

(Tr. 42).

Plaintiff makes several arguments about why this discussion is inadequate or unsupported. She claims that the ALJ "cherry-picked" the record to find statements concerning her ability to function from a psychological standpoint, stressing those statements which are consistent with a mild to moderate impairment, and ignoring those showing that Plaintiff's limitations were more severe. In a similar vein, Plaintiff contends that the ALJ was simply mistaken when she found that Plaintiff's mental exams were generally unremarkable, based on the fact that notes of these exams showed serious problems, and she asserts that the ALJ did not identify the "unremarkable" exam notes referred to in the administrative decision. She also takes issue with the ALJ's reliance on the fact that Plaintiff's

condition improved with medication, noting that Dr. Bobba was aware of the extent of such improvement but still viewed Plaintiff as being significantly limited from a psychological viewpoint.  The Commissioner, on the other hand, argues that the first assessment done by Dr. Bobba took place before a treating relationship had been established, and that the ALJ was correct in determining that the treatment notes were generally unremarkable.

    Turning to this last issue first, the general format of Dr. Bobba's office notes includes a checklist of mental status symptoms.  On almost all of them, Dr. Bobba checked boxes showing issues with one or more of Plaintiff's attitude, psychomotor activity, mood, affect, speech, concentration, and attention.  See, e.g., Tr. 629, 631, 790, 793, 796, 838, 923, and 924.  Most, if not all, of these notes show abnormal concentration and attention, and they show varying degrees of abnormality in other areas as well.  It is true that not every aspect of Plaintiff's mental status was deemed abnormal every time she saw Dr. Bobba - as the Commissioner points out, it was not unusual for Dr. Bobba's notes to reflect normal findings about Plaintiff's clean appearance, cooperative attitude, insight and judgment, lack of hallucinations, and lack of suicidal or homicidal ideation.  But a combination of normal and abnormal findings is not the same as a "generally unremarkable" examination, and the most recent office notes - the ones dated in June, 2013, see Tr. 923-24 - reflect only two areas where Plaintiff had no problems (being oriented and having normal remote memory), and nine areas of abnormality.

    Further, as Plaintiff points out, the Court's review of the ALJ's decision is also hampered by its lack of specificity; the ALJ neither mentioned any of the

unremarkable findings on which she relied nor identified any specific exhibit by number, instead lumping all 32 medical exhibits together as showing unremarkable results and general improvement in Plaintiff's condition. The combination of these deficiencies render the Court unable to determine if the ALJ's reliance on Dr. Bobba's notes as inconsistent with her opinions is a "good reason" for discounting Dr. Bobba's report, since the Court does not know which notes or which findings the ALJ meant to refer to. It is also apparent that the ALJ mischaracterized or misunderstood the office notes in question; otherwise they would not have been described as "generally unremarkable," because they contain consistent abnormal findings in areas like concentration, recent memory, and attention which are significant to a person's ability to sustain employment.

The ALJ's reliance on other factors is on more certain ground. To some extent, Plaintiff's ability to take college courses online (although she had reduced her load because of some struggles with the course requirements) and her willingness to participate in vocational rehabilitation, with a goal of returning to work, show capabilities beyond those attributed to her by Dr. Bobba. However, the ALJ herself described the purported inconsistency between Dr. Bobba's notes and her opinions as the more important factor in her decision, and the Court will not second-guess that statement. Since that factor was not properly evaluated, a remand is necessary on the treating source opinion issue.

### B. Dr. Woskobnick's Opinion

Again, the Court begins its analysis of this issue by describing how the ALJ dealt with Dr. Woskobnick's opinion. The ALJ gave it some weight, finding it "somewhat vague" but construing it as concluding that Plaintiff could sit for up to eight hours and stand up to four hours. The

determination that Plaintiff could lift only ten pounds was rejected as being based solely on Plaintiff's subjective reports, but the ALJ found the opinion otherwise "generally consistent with the claimant's testimonial account of her abilities, which is why this opinion is entitled to some weight." (Tr. 42-43).

    Plaintiff's argument concerning Dr. Woskobnick's opinion focuses on the ALJ's rejection of Dr. Woskobnick's lifting restrictions. Plaintiff contends that this restriction was based as much on the physical examination which Dr. Woskobnick conducted as it was on Plaintiff's self-reported limitations, especially since he clearly did not accept Plaintiff's self-report as to other restrictions, and that in order to find that Dr. Woskobnick simply parroted Plaintiff's own description of her symptoms, one would have to find that Dr. Woskobnick ignored instructions on the form he completed telling him not to do that. The Commissioner, in turn, argues that the ALJ was correct in noting that Dr. Woskobnick uncritically accepted Plaintiff's report as to lifting instructions and contends that the ALJ was entitled to rely on the state agency physicians' views of Plaintiff's physical functional capacity since they were supported by the evidence.

    Here, it does not appear that the discrepancy between the state agency physicians and Dr. Woskobnick is particularly significant, given that the vocational expert testified that even if Plaintiff were restricted to lifting only ten pounds, she could still perform various sedentary jobs. It is somewhat difficult to determine exactly why the ALJ thought that Dr. Woskobnick based his opinion about Plaintiff's lifting capacity on her self-report, apart from the fact that his conclusion and her description of her ability were the same; as Plaintiff correctly notes, she

-13-

self-reported other limitations to him which he did not adopt, and the form he completed contains this language (in all caps): "**IMPORTANT**: PLEASE COMPLETE THE FOLLOWING ITEMS BASED ON FINDINGS ONLY, NOT ON PATIENT'S OPINIONS OR SUBJECTIVE COMPLAINTS." (Tr. 918). Further, he was an examining source and his report was not available to either of the state agency physicians. Nevertheless, even if his opinion is deemed to be accurate as of the date it was rendered, and even if it suggested some deterioration in Plaintiff's condition between the date of Dr. Vasiloff's opinion (July 25, 2012) and the date when Dr. Woskobnick saw Plaintiff, which was March 30, 2013, resolving that issue in Plaintiff's favor, it would not have made any difference in light of the vocational testimony. The Court therefore finds no merit in this claim of error.

## C. The Knee Impairment

The medical records indicate that Plaintiff began complaining about a knee impairment (as opposed to pain beginning in her low back and radiating into her legs) in July, 2012. In the section of the administrative opinion where the ALJ discussed severe and nonsevere impairments, this condition is not mentioned at all. She discussed specifically Plaintiff's diabetes, pseudotumor cerebri, migraines, pseudopapilledema, and asthma, and said that "all other impairments alleged (or found in the record) ... are non-severe." (Tr. 36). Knee pain was mentioned in the ALJ's determination of residual functional capacity, where the ALJ observed that "[i]maging revealed degenerative changes with joint space narrowing and marginal osteophyte formation (29F/1). The claimant was advised to lose weight, reduce her caloric intake and continue with water aerobics (28/3). She was also treated with physical therapy (22F)." (Tr. 40). The ALJ did not explain how, if at all, any

limitations from Plaintiff's knee condition factored into the residual functional capacity finding.

According to Plaintiff, there are two problems with the ALJ's approach.  First, the lack of any recognition or discussion of the knee problems creates an inference that the ALJ simply failed to consider it at all in arriving at a physical residual functional capacity.  Second, the records reflect various functional limitations arising from that condition, including its effect on Plaintiff's ability to climb stairs and to walk for prolonged periods of time.  The Commissioner responds by arguing that the records indicated that Plaintiff's back pain was more limiting than any knee pain she suffered, essentially contending that any error committed by the ALJ with respect to Plaintiff's knee impairment was harmless.

Again, it is somewhat concerning that neither of the state agency physicians appear to have had the benefit of the records showing that Plaintiff specifically complained of knee pain or that there were objective findings supporting that complaint and justifying treatment.  On the other hand, the ALJ found that Plaintiff could only climb stairs occasionally, was limited in her ability to walk, and could kneel only occasionally.  None of the jobs identified by the vocational expert appear to require a good deal of walking, and the record does support the Commissioner's contentions that Plaintiff's back problem was viewed by her physicians as more limiting, that her knee was expected to respond to therapy, and that Dr. Woskobnick, whose evaluation post-dated Plaintiff's first complaints of knee pain by about seven months, did not diagnose any specific knee condition and was not told by Plaintiff that she was having knee pain.  He, too, listed back problems as her primary limiting impairment.  However, his opinion does

contain some limitations which could be attributed independently to knee problems, including his view that Plaintiff could never squat, crawl, or climb - findings that the ALJ neither commented upon nor adopted.  Under these circumstances, it is not entirely clear that the limitations imposed by Plaintiff's back condition were at least as extensive as those caused by any knee impairment or that it was unnecessary to include any additional limitations arising solely from that medical problem.  The remand on the treating source issue will give the ALJ an opportunity to re-evaluate this issue as well.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a

waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge